UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Index Nº _____ 0224

MARCIA L. CARONIA
ROCHELLE H. SCHWEIGER
DOMINICK J. CAPPELLETTI
LINDA McAULEY

**COMPLAINT**

Plaintiffs WEINSTEIN, J.

-against-

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

PHILIP MORRIS USA, INC.

★   JAN 19 2006   ★

Defendant.

BROOKLYN OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiffs Marcia L. Caronia, Rochelle H. Schweiger, Dominick J. Cappelletti and Linda McAuley, by and through their attorneys, LEVY PHILLIPS & KONIGSBERG, LLP, allege on behalf of themselves and all others similarly situated in this class action as follows:

I.      NATURE OF THE ACTION

1.      This is a class action.  It is brought on behalf of a class of current residents of New York State who a) are fifty years of age or older, b) have cigarette smoking histories of twenty pack years or more using Marlboro cigarettes[1], c) currently smoke Marlboro cigarettes, or have quit smoking Marlboro cigarettes within one year of the date on which this action is filed, and d) are not presently diagnosed as suffering from lung cancer or under investigation by a physician for suspected lung cancer.

---

[1]      "Marlboro cigarettes" is defined herein as the entire line of the Marlboro Brand Family of cigarettes, which were manufactured and sold by defendant Philip Morris, USA (and its predecessor entities) since 1955, and which presently consist of thirty-three different packages (e.g., "Marlboro Full Flavor 100's Filter Box", "Marlboro Lights 100's Filter Box", "Marlboro Ultra Lights 100's Filter Box", etc.) which are listed on the website of defendant Philip Morris as of the date of the filing of this Complaint (see www.philipmorris.com).

00057943.WPD

LEVY PHILLIPS &
KONIGSBERG, L L P
800 THIRD AVENUE
NEW YORK, N Y 10022

2.       The relief sought by plaintiffs and the class they wish to represent is equitable in nature, and discrete in focus.  Plaintiffs wish to compel defendant Philip Morris USA, Inc. ("Philip Morris") to provide them, through a court supervised program, with a specific form of medical surveillance for early detection of lung cancer.

3.       This form of surveillance is known as Low Dose CT Scanning of the chest ["LDCT"].  It is a safe, efficacious and inexpensive technique, which, for the first time, provides a means to identify and diagnose lung cancers at an early stage, when they are still curable.  Simply stated, this surveillance, if made available, will save the lives and ease the suffering of a significant number of the members of the proposed class.

4.       Lung cancer is the leading cause of cancer death in the United States and in the State of New York.  On a nationwide basis, over 160,000 Americans die annually from this disease.

5.       Over eighty percent of these lung cancer deaths are caused by cigarette smoke.

6.       Lung cancer, when diagnosed in its early stage ["Stage I" lung cancer] is usually curable.

7.       On the other hand, when lung cancer has progressed at the time of diagnosis ["Stage II" or higher] the prospects for successful treatment and cure are dim.

8.       Accordingly, lung cancer victims' prospects for cure and survival are critically dependent upon the ability to diagnose this disease as early as possible.

9.       Conventional forms of medical surveillance [e.g., chest x-rays and sputum cytology] are poor diagnostic tools for identifying early stage lung cancers.

10.      However LDCT, a surveillance technique which has recently been established, can identify and lead to the diagnosis of Stage I lung cancers which heretofore would have remained

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

undiagnosed until the cancer progressed to an advanced stage. As a consequence the prospects for cure and survival of those individuals who obtain LDCT are dramatically improved.

11.     Moreover, this LDCT can be administered to large populations at a modest annual expense [less than five hundred ($500) dollars per patient per year]; and with a lower dose of radiation than is associated with an annual mammogram.

12.     The plaintiffs herein and the proposed class are a population which, by virtue of their age and history of smoking Marlboro cigarettes, are at an increased risk for developing lung cancer.

13.     Accordingly, plaintiffs and the proposed class would benefit from the type of surveillance, LDCT, which is here at issue.

14.     By the same token, defendant Philip Morris' conduct, or more properly, its misconduct in manufacturing and selling Marlboro cigarettes, was and remains egregious and renders it liable to plaintiffs and their proposed class of Marlboro smokers to provide them with the equitable remedy sought herein.

15.     This is also true because the LDCT screening procedure sought is not presently available as a benefit in most, if not all, private or public health insurance programs.

16.     Although there are many and varied legal theories of liability which may or have been asserted against defendant Philip Morris in tobacco personal injury or wrongful death litigation, the instant plaintiffs and the proposed class proceed in this action on a single factual premise and accordingly upon discrete legal theories of fault.

17.     It is plaintiffs' contention that it was a wrongful action of defendant Philip Morris to design, manufacture, market and sell its Marlboro cigarettes because such cigarettes delivered an excessive and unreasonably dangerous quantity of carcinogens when smoked by humans.

LEVY PHILLIPS &
KONIGSBERG, L L P
800 THIRD AVENUE
NEW YORK N Y 10022

18.     It is further contended that at all relevant times, defendant Philip Morris had available to it feasible alternative designs which would have drastically reduced the cancer causing content of Marlboro cigarettes, and thus the risk of developing lung cancer as a result of the prolonged and heavy use of Marlboro cigarettes.

19.     Plaintiffs do not here advance theories of fraud, misrepresentation or failure to warn. Nor do they advance theories based upon defendant Philip Morris' practice of manipulating (i.e. spiking) the level of nicotine in its cigarettes to promote addiction. Instead, plaintiffs have narrowly plead their claims to promote a single, class resolution – which, as a practical matter, is the only available means for plaintiffs and the class to obtain the relief sought herein.

20.     Moreover, plaintiffs do not seek to otherwise recover for personal injury, or to recover compensatory or punitive damages from defendant Philip Morris. Rather, they wish only to obtain, as will be described below, a program that will provide them with one, valuable form of surveillance, LDCT, and nothing else.

## II.     JURISDICTION AND VENUE

21.     Jurisdiction in this action is predicated upon 28 USC § 1332(c) in that plaintiffs and all proposed class members are citizens and residents of the State of New York and defendant is a citizen and resident of the State of Virginia. The matter in controversy exceeds the amount or value of five million($5,000,000) dollars.

22.     Venue in this action is predicated upon 28 USC § 1391(b) and (c). This action is properly before this Court as a result of defendant's numerous contacts with the Eastern District of New York, including its marketing and sale of Marlboro cigarettes within the District at all relevant times. Venue is also proper because it is where plaintiffs and many proposed class members reside.

LEVY PHILLIPS &
KONIGSBERG L L P
800 THIRD AVENUE
NEW YORK  N Y  10022

## III.   JURISDICTION AND VENUE

### A.   Plaintiffs

23.   Plaintiff Marcia L. Caronia is a citizen of New York who resides in Suffolk County.

24.   Plaintiff and Rochelle H. Schweiger is a citizen of New York who resides in Nassau County.

25.   Plaintiff Dominick J. Cappelletti is a citizen of New York who resides in Nassau County.

26.   Plaintiff Linda McAuley is a citizen of New York who resides in Queens County.

27.   All plaintiffs are fifty years of age or older.

28.   All plaintiffs have a smoking history of twenty pack years[2] or more using Marlboro cigarettes.

29.   All plaintiffs presently continue to smoke Marlboro cigarettes or have quit the use of Marlboro cigarettes within one year of the date on which this Complaint is filed.

30.   None of the plaintiffs is presently diagnosed with lung cancer.

31.   All of the plaintiffs are at significantly increased risk for developing lung cancer as a consequence of their use of Marlboro cigarettes and specifically as a consequence of the excess quantities of carcinogens delivered by Marlboro cigarettes.

32.   All plaintiffs are desirous of obtaining LDCT lung cancer surveillance so that, any undiagnosed lung cancer can be detected as early as possible so as to dramatically improve their chances for survival and cure as well as the quality of their lives.

---

[2]   A "pack year" is the number of packs of cigarettes smoked per day multiplied by the number of years. For example, one pack of cigarettes smoked per day for one year equals one pack year. Two packs of cigarettes smoked per day for one year equals two pack years.

LEVY PHILLIPS &
KONIGSBERG, L L P
800 THIRD AVENUE
NEW YORK, N Y 10022

33.     LDCT is not presently available to plaintiffs for lung cancer surveillance through their personal health insurance.

**B.     Defendant**

34.     Philip Morris USA, Inc. ("Philip Morris"), formerly Philip Morris, Inc., is a Virginia corporation with its principal place of business in a state other than New York. At all times relevant hereto, Philip Morris was in the business of manufacturing, promoting, marketing, distributing and selling Marlboro cigarettes.

## IV.     CLASS ACTION ALLEGATIONS

35.     Plaintiffs make these allegations pursuant to rule 23 of the Federal Rules of Civil Procedure. Each prerequisite of Rule 23 applicable to this case is met.

36.     The Class is composed of at least tens of thousands of persons, the joinder of whom is impracticable except by means of a class action. The disposition of their claims in a class action will benefit both the parties and the Court. At all relevant times, defendant sold and continues to sell hundreds of thousands or millions of packs of Marlboro cigarettes in New York State each year, and thus the Class is sufficiently numerous to make joinder impracticable, if not completely impossible.

37.     Plaintiffs assert claims that are typical of the claims of the entire Class. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to those of the Class. Plaintiffs have retained counsel who are competent and experienced in this type of litigation.

38.     Defendant has acted or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class as a whole appropriate.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

39.     Plaintiffs and the Class have suffered the same harm as a result of defendants' wrongful conduct as alleged herein. Absent a class action, Class members will continue to suffer harm, thereby allowing these alleged violations of law to proceed without remedy.

40.     Plaintiffs anticipate that there will be no insurmountable difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

41.     All conditions precedent to the maintenance of this action have been met.

42.     There are common questions of law and fact applicable to the entire class.

## V.     DEFENDANT PHILLIP MORRIS' MISCONDUCT

43.     Mainstream cigarette smoke is commonly described in two phases – the vapor phase and the particulate phase.

44.     The vapor phase begins when a cigarette is lit and puffed on. On the first and each subsequent puff, the solid material in the cigarette turns into a vapor in which more than 4,000 chemicals have been identified.

45.     Subsequently, the particulate phase occurs when the vapor of chemicals condenses into smoke in the form of microscopic, liquid particles.

46.     The particulates in mainstream smoke are measurable by the smoking of cigarettes by a machine under a method set forth by the Federal Trade Commission ("FTC").

47.     Under the FTC testing method, the mainstream smoke is collected on a filter pad that collects 99% of the cigarette smoke particulates over 0.1 micron. The total particulate matter of the mainstream smoke is known as the TPM.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

48.     Cigarette tar is the weight of the TPM minus nicotine and water.  Neither nicotine or water cause lung cancer.  Cigarette tar – consisting of all the other measured particulates -- contains carcinogens which cause lung cancer.

49.     Numerous carcinogens have been specifically identified in cigarette tar including but not limited to: Tobacco Specific Nitrosamines and Polynuclear Aromatic Hydrocarbons.

50.     Philip Morris has known since the 1950s, or earlier, that carcinogens in cigarette tar cause cancer.  For example, in a study published by Dr. Ernst Wynder, *et al.*, in 1953, cancer was induced in laboratory animals with the application of cigarette tar to mouse skin.

51.     Philip Morris has also known since the 1950s, or earlier, that the greater the exposure to carcinogens from cigarette tar, the greater the risk of cancer.  In 1957, Dr. Wynder published further findings, observing a clear dose response between the amount of carcinogens from tar applied to the skin of mice and the percentage of skin papilloma and carcinoma-bearing animals in the test group.

52.     Philip Morris' corporate representatives and long-time research scientists have admitted under oath in Court that the more cigarette tar to which a human is exposed, the greater the likelihood of lung cancer, and that a cigarette that truly delivers lower amounts of tar to humans is a safer cigarette.  These admissions by Philip Morris are supported by epidemiological studies reflecting a greater risk of lung cancer in those smoking at least one pack per day of relatively higher tar cigarettes – as determined by FTC testing -- for twenty (20) years or more.

53.     Since the initial marketing of Marlboro cigarettes in 1955 through the present ("the relevant time period"), Philip Morris has utilized numerous cigarette design parameters to specify the approximate amount of cigarette tar delivered to a smoker by smoking a cigarette.

00057943.WPD                              -8-

54.     During the relevant time period, all Marlboro cigarettes – regardless of their designation as Regular, Medium, Light, Ultra Light, etc. – delivered greater than 5 mg of cigarette tar when smoked by the FTC smoking machine.  For example, the present FTC tar yields of Marlboro Reds, Marlboro Lights and Marlboro Ultra Lights in the State of New York are:  17 mg, 11mg, and 6 mg, respectively.

55.     During the relevant time period, Philip Morris has purposely designed all of its Marlboro cigarettes to deliver an excessive amount of carcinogens when smoked by humans.

56.     During the relevant time period, Marlboro cigarettes that have delivered a relatively lower amount of tar under FTC testing, have also delivered a relatively lower amount of nicotine, while maintaining an approximate 10:1, or higher, tar to nicotine ratio.  This has always been true for all cigarettes with a Marlboro "Light" designation.  For example, under FTC testing, Regular "Full Flavor" Marlboro cigarettes deliver 17 mg tar and 1.3 mg nicotine; Marlboro "Light" cigarettes deliver 11mg tar and .9 mg nicotine; Marlboro "Ultra Light" cigarettes deliver 6 mg tar and .5mg nicotine).

57.     Numerous authorities, including the National Cancer Institute, have concluded that smokers will unconsciously "compensate" by taking deeper, more intense puffs when smoking cigarettes with relatively lower FTC machine-measure yields of tar and nicotine in order to unconsciously obtain more nicotine.  This deeper, more intense puffing results in the inhalation of not only greater amounts of nicotine, but greater amounts of tar in the same proportion.

58.     Philip Morris acknowledges on its website that: "[S]mokers 'compensate' for the reduced tar and nicotine yields of some brands by smoking them differently than they would higher yield brands.  For example, they may take more or larger puffs...  Generally speaking, the more intensely a smoker smokes a cigarette, the more tar and nicotine he or she will inhale from that cigarette."

00057943.WPD                                    -9-

LEVY PHILLIPS &
KONIGSBERG L L P
800 TH RD AVENUE
NEW YORK N Y 10022

59.     Philip Morris has manufactured, marketed, and sold Marlboro "Light" cigarettes from 1971 through the present.  During all of these years, Philip Morris purposely designed these cigarettes to deliver relatively lower amounts of tar under FTC testing, while knowing full well that human smokers would unconsciously compensate, as described above, and actually inhale higher amounts of tar, which contain carcinogens that cause lung cancer.

60.     In fact, since they were first marketed in 1971 through the present, a person who smokes Marlboro "Light" cigarettes -- which yield greater than 10 mg of tar under FTC testing -- will inhale the approximately the same amount of tar as delivered by regular Marlboro "Full Flavor" cigarettes.

61.     During the relevant time period, it was technologically feasible for Philip Morris to design a cigarette which prevented smokers from taking the deeper, more intense inhalation that characterize compensatory smoking.  Philip Morris could have accomplished this, among other ways, by simply increasing the "resistance to draw" on the cigarette, which prevents the smokers from substantially increasing their puff volume on the cigarette.  This is in sharp contrast to the Marlboro "Light" cigarette which was intentionally designed to permit full compensation.

62.     During the relevant time period, it was technologically feasible for Philip Morris to design a cigarette which: (a) delivered 1 mg, or less, of tar under FTC testing; and (b) did not permit a smoker to significantly "compensate" when smoking.

63.     For example, in 1979, Philip Morris developed a cigarette which delivered one tenth (0.1) of a milligram, or less, of tar under FTC testing, and which did not permit a smoker to compensate significantly.  This cigarette was the original, lowest tar Cambridge cigarette, which was initially advertised by Philip Morris, but removed from the market shortly thereafter.

00057943.WPD                                             -10-

LEVY PHILLIPS &
KONIGSBERG. L L P
800 TH RD AVENUE
NEW YORK N Y 10022

64.     After Philip Morris removed the original, lowest tar Cambridge cigarette from the market, it sold other versions of Cambridge which delivered higher amounts of tar.  Thus, Philip Morris did not seriously market the original, lowest tar Cambridge brand cigarette, but it instead used this original design merely to establish a brand image for Cambridge as the "lowest tar" cigarette.

65.     During the relevant time period, not only was it feasible for Philip Morris to reduce tar levels to 1 mg, or less, while utilizing a filter that was designed to prevent the smoker from significantly compensating, but it was also feasible for Philip Morris to significantly reduce the amount of specific, known carcinogens in cigarette smoke through tobacco selection and the manufacturing process.

66.     For example, during the relevant time period, Philip Morris knew that different tobaccos have different levels of specifically identified carcinogens.  Specifically, Burley tobacco is known to be relatively high in nitrogen, and as such, contains relatively high amounts of nitrosamines, including tobacco-specific nitrosamines, which are known to be carcinogenic.

67.     During the relevant time period, Philip Morris purposely included significant amounts of Burley tobacco in the tobacco blend for all Marlboro cigarettes, further contributing to the defective design of such cigarettes.

68.     During the relevant time period, it was technologically feasible for Philip Morris to use a tobacco blend for Marlboro cigarettes, which did not utilize Burley tobacco, and which delivered a lower level of carcinogens including a lower level of volatile nitrosamines, including tobacco specific nitrosamines.

69.     As a proximate result of the aforementioned defects, the plaintiffs and each and every class member were exposed to an excessive amount of carcinogens the result of smoking Marlboro cigarettes for a minimum of 20 pack years – representing a minimum of at least 7,300 packs

00057943.WPD                                    -11-

LEVY PHILLIPS &
KONIGSBERG L L P
800 THIRD AVENUE
NEW YORK N Y 10022

of Marlboro cigarettes, and a minimum of 146,000 Marlboro cigarettes smoked by plaintiffs and each and every class member.

70.     The aforementioned defects in Marlboro cigarettes was a proximate cause, or a substantial factor, in significantly increasing the risk of lung cancer for plaintiff and each and every class member, irrespective of the individual medical histories of the plaintiffs and of each and every class member.

71.     In addition and/or in the alternative, the aforementioned defects in Marlboro cigarettes was a proximate cause, or substantial factor, in substantially increasing the lung cancer risk of the plaintiffs and each and every class member, as compared to what the lung cancer risk, if any, would have been had the plaintiffs and each and every class member smoked a safer cigarette which delivered substantially less carcinogens when smoked by humans.

72.     In addition and/or in the alternative, as the proximate result of the aforementioned defects, each and every pack-year of Marlboro cigarettes smoked by plaintiffs and each and every class member, substantially increased, and substantially aggravated, the lung cancer risk of plaintiffs and each and every class member.

## VI.    PLAINTIFFS' REMEDY

73.     In the United States, at the present time, roughly 25 percent of the population smokes cigarettes. The lifetime risk of developing lung cancer among cigarette smokers is approximately ten percent. Accordingly more than 170,000 new patients are diagnosed each year with lung cancer.

74.     In those cases where Stage I lung cancer is diagnosed, the prospects for cure, usually through surgical resection, are excellent.

LEVY PHILLIPS &
KONIGSBERG. L L P
850 THIRD AVENUE
NEW YORK. N Y  10022

75.     Unfortunately, ordinary chest x-rays, sputum cytology and physical examination are distinctly less effective in identifying or diagnosing early stage lung cancer. Accordingly, as an historical matter there was no systematic way to diagnose or identify lung cancer until it had progressed to Stage II. At this point, however, with Stage II disease, a patient's prognosis is grim.

76.     The development of LDCT has changed this equation. Research in this country and Japan has demonstrated that CT screening is capable of identifying pulmonary nodules that commonly turn out to be malignant upon further diagnostic workup, nodules too small to be identified by means of traditional radiography.[3]

77.     Various programs have now been designed to institute screening for lung cancer using this LDCT regimen.

78.     These programs involve:

(a)     Outreach and education to inform people in the class of the availability of this screening program and of its potential benefits and harms.

(b)     Informed consent procedures to advise potential members of the screening program of the possible harms or consequences of the screening so that they might make an educated and informed decision about whether to participate in the program.

(c)     Uniform practices respecting the manner and the timing or interval in which the screening technique will be administered.

(d)     Uniform practices respecting the manner in which these findings are to be interpreted and what steps need to be taken to follow-up in those individuals where the CT findings are equivocal and require further investigation.

---

[3]     To the extent applicable, plaintiffs and the proposed class assert entitlement to the remedial provisions of CPLR § 214-c(4).

LEVY PHILLIPS &
KONIGSBERG L L P
800 THIRD AVENUE
NEW YORK, N Y 10022

    (e)    Medical counseling respecting the results of the CT scans.

79.    The cost of this screening program on an annualized per patient basis, including all administrative and educational expenses, is quite modest. This program can be administered, in total, for less than $500.00 per patient per year.

80.    As a matter of New York law, defendant Philip Morris, given its misconduct, is legally and equitably responsible to provide plaintiffs and the proposed class with an LDCT lung cancer surveillance program.

### AS AND FOR A FIRST CAUSE OF ACTION
### STRICT LIABILITY - DEFECTIVE DESIGN

81.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as if hereinafter set forth at length.

82.    Philip Morris, while regularly engaged in the business activities aforementioned, did design, develop, manufacture, sell, market, and/or distribute Marlboro cigarettes which were purchased and smoked by the plaintiffs and by members of the proposed class.

83.    The Marlboro cigarettes were expected to and did reach the usual consumers, including plaintiff and the proposed class, without substantial change in the condition in which they were designed, produced, manufactured, sold, distributed and marketed by the Philip Morris.

84.    By smoking the Marlboro cigarettes, plaintiffs and the proposed class used the product for the purpose and manner intended by Philip Morris.

85.    Philip Morris knew or should have known that at all times mentioned the Marlboro cigarettes were in a defective condition and not reasonably safe for their intended use.

86.    Philip Morris knew or should have known that cigarettes caused lung cancer and other diseases, and placed those who smoked these cigarettes at greatly elevated risk for developing lung cancer.

LEVY PHILLIPS &
KONIGSBERG L L P
800 THIRD AVENUE
NEW YORK, N.Y. 10022

87.    With this knowledge Philip Morris voluntarily designed Marlboro cigarettes in a defective condition for consumption by plaintiffs and the proposed class.

88.    During all relevant time periods up to an including the present, while defendant Philip Morris designed Marlboro cigarettes in a defective condition, the company was able to create a "safer" cigarette which delivered substantially less carcinogens when smoked by a human.

89.    Instead, Philip Morris, during all relevant time periods up to and including the present, defectively designed the Marlboro cigarette to deliver an excessive amount of carcinogens when smoked by humans.

90.    Philip Morris has designed, manufactured and distributed a defective product which created an unreasonable risk to the health of consumers, and defendant is therefore strictly liable for the medical surveillance now required by the intended use of this defective product.

91.    The aforementioned defects in Marlboro cigarettes were a substantial factor in causing plaintiffs to be at increased risk of developing lung cancer, and therefore to require the medical surveillance described herein.

92.    Based on the foregoing misconduct, plaintiffs demand the relief set forth in ¶¶ 77-92, *infra* and the **WHEREFORE** Clause, *infra*.

## AS AND FOR A SECOND CAUSE OF ACTION
## NEGLIGENT DESIGN AND TESTING

93.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as if hereinafter set forth at length.

94.    Philip Morris had a legal duty to create a reasonably "safer" cigarette which delivered substantially less carcinogens when smoked by a human.

95.    Philip Morris breached this duty by negligently, recklessly, and/or intentionally designing the Marlboro cigarette to deliver excessive amounts of carcinogens when smoked by humans.

LEVY PHILLIPS &
KONIGSBERG, L.L.P
800 THIRD AVENUE
NEW YORK, N.Y. 10022

96.     At all relevant times, Philip Morris further breached this duty, and was negligent, by failing to properly test and inspect Marlboro cigarettes and other cigarettes, for purposes of identifying, developing, implementing and bringing to market a reasonably safer cigarette design.

97.     At all relevant times, Philip Morris failed to employ the state of knowledge and technology then available to the tobacco industry.

98.     Philip Morris thereafter caused Marlboro cigarettes to be shipped from the place of manufacture and caused them to be delivered to a place or point within the State of New York where it was foreseeable that they would be, and were in fact, purchased by the public, including plaintiffs and the proposed class.

99.     During all relevant time periods, Philip Morris knew or should have known that Marlboro cigarettes, and similarly designed cigarettes, would cause lung cancer and other serious health problems.

100.    The aforementioned defects in Marlboro cigarettes were a substantial factor in causing plaintiffs to be at increased risk of developing lung cancer, and therefore to require the medical surveillance described herein.

101.    Based on the foregoing misconduct, plaintiffs demand the relief set forth in ¶¶ 77-92, *infra* and the **WHEREFORE** Clause, *infra*.

### AS AND FOR A THIRD CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY

102.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as if hereinafter set forth at length.

103.    At all relevant times herein, Philip Morris marketed, tested, manufactured, promoted, distributed and/or sold Marlboro cigarettes for use by the public at large including plaintiffs

LEVY PHILLIPS &
KONIGSBERG L L P
800 THIRD AVENUE
NEW YORK N Y 10022

and the proposed class. Philip Morris knew the uses for which Marlboro cigarettes were intended and impliedly warranted said product to be of merchantable quality, safe and fit for use.

104.   Contrary to the implied warranty, Marlboro cigarettes were not of merchantable quality or safe or fit for their intended use, because said product is unreasonably dangerous and unfit for the ordinary purpose for which it was used.

113.   The aforementioned breaches of warranty were a substantial factor in causing plaintiffs to be at increased risk of developing lung cancer, and therefore to require the medical surveillance described herein.

114.   Based on the foregoing misconduct, plaintiffs demand the relief set forth in ¶¶ 77-92, *infra* and the **WHEREFORE** Clause, *infra*.

## PLEADING OF EXCEPTIONS TO ARTICLE 16 OF THE C.P.L.R.

105.   To the extent any defendant pleads, or otherwise seeks to rely upon, Article 16 of the New York Civil Practice Law and Rules (C.P.L.R.) to have fault apportioned to another allegedly culpable party, plaintiffs expressly states that the exceptions set forth in CPLR §§ 1602 (7) and (11) are applicable because: (1) defendant caused plaintiffs' injuries "by having acted in reckless disregard for the safety of others" (CPLR § 1602 (7)); and (2) defendant "acted knowingly and intentionally, and in concert, to cause the acts or failures upon which liability is based" (CPLR § 1602 (11)).

**WHEREFORE**, plaintiffs demand judgment for themselves and other members of the proposed class as follows:

A.   Declaring this action to be a class action properly maintained pursuant to F.R.C.P. Rule 23;

B.   Granting temporary, preliminary and permanent equitable and/or injunctive relief as permitted by law, equity or applicable statutory provisions thereby compelling defendant Philip

LEVY PHILLIPS &
KONIGSBERG, L L P
800 THIRD AVENUE
NEW YORK N Y 10022

Morris to provide plaintiff and the proposed class with an adequately funded Court supervised and administered lung cancer surveillance program to: 1) implement an outreach program to notify prospective class members of the availability and benefits of the program, 2) provide plaintiffs and prospective class members with information so that they might exercise informed consent to join the program, 3) provide ongoing screening itself, 4) provide information to screened plaintiffs and class members respecting the results of screening, 5) pay for counsel fees and other expenses associated with the prosecution of this action and the administration of the program, 6) keep proper records respecting the outcome of the screening program, and 7) provide for all administrative expenses associated with establishing the eligibility of any class member for this program;

    C.  Awarding plaintiffs, the costs and disbursements of this action, including attorneys' and experts' fees and costs and all other consequential losses and expenses; and

    D.  Granting such other and further relief as the nature of the case may require and as this Court deems just and proper under the circumstances.

Dated: New York, New York
   January 19, 2006

          LEVY PHILIPS & KONIGSBERG, LLP
          *Attorneys for Plaintiffs*

      By: _____
          Steven J. Phillips [SP 9658]
          Jerome H. Block [JB 5411]
       800 Third Avenue, 13th Floor
       New York, New York 10022
       (212) 605-6200

LEVY PHILLIPS &
KONIGSBERG L.L.P
800 THIRD AVENUE
NEW YORK, N.Y. 10022